**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMIE PANDURE, | Civil Action No. 10-4426 (FLW) |
| Petitioner, | |
| v. | **OPINION** |
| MICHELLE RICCI, | |
| Respondent. | |

**APPEARANCES**:

> JAMIE PANDURE, #304087/373718C
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625
> Petitioner *Pro Se*

> MARY JULIANO, ASSISTANT PROSECUTOR
> MONMOUTH COUNTY PROSECUTOR
> 71 Monument Park
> Freehold, New Jersey 07728
> Attorneys for Respondents

**WOLFSON, District Judge**:

Jamie Pandure filed an all-inclusive Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Pandure challenges a judgment filed in the Superior Court of New Jersey, Monmouth County ("trial court"), on August 21, 1998, after a jury found him guilty of the murder of, and conspiracy to murder his wife Wanda Pandure. *See State v. Pandure*, Docket No. A-1078-98T4 slip op. (N.J. Super. Ct., App. Div. Jul. 25, 2001) (ECF No. 11-27.) The State filed an Answer, and Pandure filed a Reply. After carefully reviewing the matter, this Court will dismiss the Petition on the merits and decline to issue a certificate of appealability.

## I.   BACKGROUND

A grand jury of the State of New Jersey, sitting in Monmouth County, returned an indictment charging Jamie Pandure with the capital offense of procuring the death of his wife by the payment or promise of money, conspiracy to murder Wanda, conspiracy to murder his former girlfriend and other unnamed witnesses, possession of a handgun without a permit, and possession of a firearm for an unlawful purpose.   (Indictment, ECF Nos. 11-22 at 87; 11-27 at 1-2.)   The same indictment also charged his brother Joel Pandure, and his brother-in-law Francis Bennett with related offenses, including Wanda's murder and the conspiracy to murder her, but the charges against Joel Pandure and Francis Bennett were severed.[1]   After a trial, a jury found Jamie Pandure guilty of the murder of Wanda and conspiracy to murder, but acquitted him of conspiracy to murder witnesses and the weapons charges.   The jury rendered Pandure ineligible for the death penalty, as it did not unanimously find that he had paid money or promised to pay money to have Wanda murdered.   After denying Pandure's motion for a new trial, the trial court imposed an aggregate 75-year term of imprisonment, with a 30-year period of parole ineligibility.   (Judgment, ECF No. 11-22 at 104.)   Pandure appealed, and on July 25, 2001, the Appellate Division affirmed the conviction and sentence.   (ECF No. 11-27.)   On October 23, 2001, the New Jersey Supreme Court denied certification.   (ECF n. 12.)

On May 21, 2002, Pandure filed a *pro se* petition for post-conviction relief ("PCR petition").   (ECF Nos. 5 at 6; 12-9 at 79.)   Through counsel, he filed a brief and appendix. (ECF No. 12-4.)   Without conducting an evidentiary hearing, the Law Division denied relief by

---

[1] Francis Bennett was convicted of murder and other offenses and Joel Pandure pled guilty to lesser offenses.   (ECF No. 11-27 at 2.)

order filed August 27, 2008.   (ECF No. 12-9 at 9, 112.)   Pandure appealed, and on May 5, 2010, the Appellate Division summarily affirmed for the reasons set forth in the trial judge's oral opinion.   *See State v. Pandure*, Docket No. A-0609-08T4, 2010 WL 1924842 (N.J. Super. Ct., App. Div.), *certif. denied*, 203 N.J. 96 (2010).

Pandure signed his original § 2254 petition on August 21, 2010.   After this Court notified Pandure of his rights pursuant to *Mason v. Meyers,* 208 F.3d 414 (3d Cir. 2000), Pandure elected to have this Court dismiss the original petition without prejudice to his filing an all-inclusive Amended Petition ("the Petition"), which he signed and submitted to the Clerk for filing on June 20, 2011.   (ECF No. 5.)   The all-inclusive § 2254 Petition raises the following grounds, four of which concern the ineffective assistance of trial counsel:   Pandure's July 6, 1991, written statement should have been suppressed because police did not comply with *Miranda v. Arizona* (Ground One); the identifications of Pandure by William Gray, Johnnie Maye Brown, and Louise Jacobs, should have been suppressed (Ground Two); the trial court's limitation of the cross-examination of Gary LaPatta, a jailhouse snitch, deprived him of due process (Ground Three); the State deprived Pandure of his constitutional right to a speedy trial (Ground Four); pretrial publicity deprived him of a fair trial (Ground Five); the trial court's failure to conduct a hearing or individually *voir dire* jurors deprived him of a fair trial and impartial jury (Ground Six); and counsel was constitutionally deficient in failing to object to the prosecutor's use of a time chart during summation and failing to present a defense graphic display (Ground Seven), failing to object to the seating of juror 13 or to seek a mistrial based on juror misconduct (Ground Eight), failing to pursue the jury's extra-judicial information (Ground

3

Nine), and failing to move for a mistrial or the dismissal of a juror who saw Pandure in restraints (Ground Ten).   (ECF No. 5 at 13-33.)

The State filed the record and an Amended Answer (arguing that certain grounds do not assert federal claims and Pandure is not entitled to habeas relief on the merits) and, after this Court ordered the State to provide Pandure with the state court record filed in this Court, Pandure filed a Reply to the Answer.

## II.   STANDARD OF REVIEW FOR RELIEF UNDER § 2254

Section 2254 of title 28 of the United States Code sets limits on the power of a federal court to grant a habeas petition to a state prisoner.   *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).   Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   Where a state court adjudicated petitioner's federal claim on the merits,[2] as in this case, a court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States', or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)). The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record

---

[2] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that 1) finally resolves the claim, and 2) resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground."   *Shotts v. Wetzel,* 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

4

that was before the state court that adjudicated the claim on the merits.  *See Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court.  *See Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004). "[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall,* 134 S.Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).   A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."  *Williams*, 529 U.S. at 405-06.   Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*, 529 U.S. at 413.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply.   First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."   29 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).   Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).

### III.   DISCUSSION

A.   *Miranda* Violation (Ground One)

In Ground One, Pandure argues that the failure to suppress his statement to the police the day after his wife's July 5, 1991, murder violated *Miranda v. Arizona*, 384 U.S. 436 (1996). The State argues that Pandure has not rebutted the state courts' factual determination that the statement was knowing and voluntary, and he has failed to show that the state's adjudication of his *Miranda* claim was contrary to, or an unreasonable application of *Miranda* or other clearly established holdings of the Supreme Court.

Pandure raised his *Miranda* claim on direct appeal, arguing that, where Detective Contu admitted on cross-examination that Pandure became a suspect less than two days after he gave the statement, *Miranda* required the officers to give Pandure the *Miranda* warnings prior to interrogating him because the police "should [have] kno[wn] that a detention and questioning was likely to result in some type of incriminating response from" Pandure.   (ECF No. 11-22 at 56.)   The Appellate Division rejected Pandure's argument on the basis of the trial judge's findings and decision.   (ECF No. 11-27.)   After conducting an evidentiary hearing on the *Miranda* issue, the trial judge determined that the *Miranda* warnings were not required because Jamie Pandure was not in custody, but he was free to leave, when he gave the two exculpatory statements within two days of the murder of his wife:

> Jamie Pandure's statements were on the night and morning after the murder of Wanda Pandure, his wife who was shot and killed at her office on the evening of July 5th in Red Bank, New Jersey . . . .   The fact that they were exculpatory

6

statements doesn't change the picture.   A plain reading of the *Miranda* opinion itself indicates that it applies to so-called exculpatory statements.

*                       *                       *

Now, it is admitted that neither of Jamie's statements, that one given at the hospital or later that evening at the Red Bank Police Department . . . were *Mirandized* statements.   So the test that the Court must apply in determining whether or not to suppress those statements is a very fact sensitive test.   The determinative consideration is whether a reasonably innocent person in such circumstances would conclude that he was not free to leave.   The elements which go into that fact sensitive determination are the duration of the detention, the nature and degree of pressure applied to detain the suspect, the physical surroundings of the questioning, the language used by the officers in summoning the individual or in questioning the individual, among others.

Now, concerning Jamie Pandure, there are basically two statements that we are dealing with.   Officer Meyers and Sergeant Guy McCormack were detailed by Captain Canneto to go to Riverview Hospital on the night in question because Jamie had been taken there because of some physical ailment.   And they were to ascertain the condition of Jamie and speak to him, if possible.   There they were able to speak with him briefly and made some routine inquiries concerning his marriage, the victim, his address, his financial condition, the existence of insurance, ownership of a gun and its whereabouts.   He ultimately responded to a request, when he was released from the hospital would he stop down to the Red Bank Police Department to speak to Detectives Donovan and Coutu.   He did so after being brought there by his family, and spoke to Donovan and Coutu for approximately 50 minutes, and ultimately gave a written statement concerning his whereabouts during that day.   The testimony concerning those two statements, if you consider them two, seemed to this Court to be relatively clear.   They were not contested by Jamie Pandure in that he did not testify . . . .   There seems to be no suggestion that he did not think he could leave at any time.   In fact, he was with his family.   And in fact, as soon as it was over, he was transported by them home.   So there is no suggestion that would lead me to a determination that he did not feel he was free to leave . . .   Well, that closes the door on the inquiry, because I have to say, based on that, notwithstanding all of the testimony the Court took from the police officers, that even the defendant felt he was free to leave at any time.   And therefore, *Miranda* warnings were not necessary.   And the motion to suppress . . . is denied.

(ECF No. 9-20 at 2-5.)

7

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination.   *See Malloy v. Hogan*, 378 U.S. 1, 8 (1964).   In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."   384 U.S. at 467.   The *Miranda* Court explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *id.* at 444,[3] but the *Miranda* Court did not apply the test to any set of facts, *Yarborough v. Alvarado,* 541 U.S. 652, 661 (2004).

The Supreme Court has discussed *Miranda's* "in custody" requirement in several cases. For example, in *Oregon v. Mathiason,* 429 U.S. 492 (1977) (per curiam), after noting that an officer's obligation to administer *Miranda* warnings attached "only where there has been such a restriction on a person's freedom as to render him 'in custody'", *id.* at 495, the Court held that Mathiason was not in custody because there was "no indication that the questioning took place in a context where [the suspect's] freedom to depart was restricted in any way," *id.* at 495, even though a burglary suspect came to a nearby police station after a police officer contacted the suspect after the victim had identified him, where "at the outset of the questioning, the officer

---

[3]  The Court explained that, "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."   *Miranda* 384 U.S. at 467.

stated his belief that the suspect was involved in the burglary but that he was not under arrest," and the suspect was permitted to leave after he had admitted his guilt.   *Yarborough,* 541 U.S. at 661.   In *California v. Beheler,* 463 U.S. 1121 (1983) (*per curiam*), the Court reversed the state court's determination that Beheler was in custody where the police interviewed Beheler shortly after the crime, Beheler had been drinking earlier in the day, he was emotionally distraught, he was known to the police, and he knew he had to cooperate because he was a parolee.   The Supreme Court emphasized that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," and that the police's knowledge of the suspect and how much time had elapsed since the crime occurred were irrelevant to the in-custody inquiry.   *Beheler,* 463 U.S. at 1125.

In *Yarborough,* the Court quoted *Thompson v. Keohane,* 516 U.S. 99, 112 (1995), to describe the *Miranda* custody test:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Yarborough,* 541 U.S. at 663 (quoting *Thompson,* 516 U.S. at 112).

In *Stansbury v. California,* 511 U.S. 318 (1994), the Court reversed the state court's determination that Stansbury was in custody "by virtue of the fact that he had become the focus of the officers' suspicions, *id.* at 326, and held that "it is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda* . . . .   Save as

9

they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry."   *Stansbury,* 511 U.S. at 324.

In this case, the New Jersey courts found that Pandure was not "in custody" for the purposes of *Miranda* because he voluntarily came to the police station and he was free to leave the police station when the police asked him general questions after his wife was found murdered at the doctor office where she worked.   Pandure is not entitled to habeas relief on his *Miranda* claim under § 2254(d)(1) because the New Jersey courts' adjudication of his claim was not contrary to, or an unreasonable application of *Miranda* and its progeny.   *See Yarborough*, 541 U.S. at 664 (holding that where "fairminded jurists could disagree over whether Alvarado was in custody," the state court's application of the *Miranda* custody standard was not unreasonable under § 2254(d)(1) and reversing the Court of Appeals' granting of the writ).   He is not entitled to habeas relief under § 2254(d)(2) because he has not shown that the New Jersey courts' unreasonably determined the facts, including the factual finding that Pandure was free to leave, in light of the evidence presented.

B.   Suppression of Identifications (Ground Two)

In Ground Two, Pandure asserts that "[t]he out-of court identifications of Petitioner by William Gray, Johnnie Mae Brown and Louise Jacobs, and their subsequent in-court identifications, should have been suppressed."   (ECF No. 5 at 13.)   As factual support, he alleges that the identifications were not based upon the witnesses' own independent recollection, but upon the suggestive conduct of the police, and that the "nearly twenty month delay between

the witnesses['] contact with petitioner and their out-of-court photographic identifications rendered their identifications unreliable."   (ECF No. 5 at 15.)   The State argues that this Court must reject the habeas ground because Pandure has not rebutted the state courts' factual determinations that the pretrial identifications were not impermissibly suggestive and that the identifications were reliable, and the New Jersey courts applied clearly established Supreme Court precedent.

Pandure raised his challenge to the identifications of him by three persons on direct appeal.   (ECF No. 11-22 at 63.)   Relying on *United States v. Wade,* 388 U.S. 218 (1967), and *Manson v. Braithwaite,* 432 U.S. 98 (1977), he argued that the identification procedures used by the police were impermissibly suggestive and, even if the procedures were not impermissibly suggestive, the procedures resulted in a substantial likelihood of irreparable misidentification. Specifically, he argued that the 20-month delay between the witnesses contact with the suspect and their out-of-court photographic identifications violated his due process right to a reliable identification.   (ECF No. 11-22 at 67.)   The Appellate Division affirmed the trial court's ruling on this issue without discussion.   After conducting a *Wade* hearing over the course of two days, the trial court found that there was no substantial likelihood of misidentification:

> The theory of the State['s] case is that Jamie Pandure and his brother Joel and one Richard Bennett, their brother-in-law, conspired to kill Jamie Pandure's wife to recover upwards of $750,000 worth of insurance on her life.   Sergeant Dowling and Detective Coutu from the Red Bank Police Department, after speaking with a person by the name of DesLonde, got information which was indirectly through Richard Bennett, that immediately prior to the murder which occurred [i]n July [] of 1991, Jamie Pandure and Bennett were in Lakewood soliciting people to assist them in obtaining a handgun.

\*                    \*                    \*

Now, the test on a *Wade* Hearing is a twofold test.  Number one, where the photographic identification procedure is suggestive and if they were suggestive, was there a substantial likelihood of police identification [sic].  Now, here the identification procedures of the individual . . . were generally of single photographs or as in S-30, kind of a weight watchers advertisement.  It is an advertisement for Golds Gym, which has a photograph that was identified by all three witnesses.

Now, we know that the display of only one photograph to the [ ] witness, does not in itself, constitute a due process violation . . . .  Granted, while the procedures here are not the preferred procedure of a photo display, I am satisfied that there was not a substantial likelihood of misidentification of either the defendant Jamie Pandure or the motor vehicles . . . .  First of all, notwithstanding the fact that there were inconsistencies between Officer Dowling's testimony and some of the witnesses and [O]fficer Coutu's testimony and some of the witnesses, the thing that strikes this Court is that notwithstanding a so-called motley group of people, what they said had a vivid ring of truth.  What I am really saying is, we are dealing with perhaps a pimp, a prostitute, and a madam who is running a crack house, but they struck me as being frank and truthful and they were positive in their identifications.  Now, at the time I was listening to the testimony, I did not have the exhibits in front of me.  Now, looking at S-31, there is no question that anybody could be mistaken about it.  Number one, they all described him as a big fat man, huge.  It is the most significant thing about him is his girth and size.  To prepare a photo array of people of similar size and girth . . . I suggest might even be impossible . . .  I think you would have to go to World Wrestling to find the most overweight wrestlers that you could find and then they probably wouldn't look anything like him at all.  There is almost no way to match up the person that shows in S-31 with anybody else and have it be considered a fair display.  As I said, they were positive and solid in their identifications.  Therefore, I am satisfied that there is no substantial likelihood of misidentification at all, and the evidence of these out-of-court identifications made by William Gray, Miss Jacobs, and Jonnie Mae Brown are going to be admissible during the course of this trial.

(ECF No. 9-19 at 2-8.)

The Supreme Court has observed that improper pretrial identification procedures by police may cause witnesses to misidentify a criminal.  *See Simmons v. United States*, 390 U.S. 377, 383 (1968).  An identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of

irreparable misidentification."   *Id*. at 384.   In that case, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."   *Id.* at 383-84. "It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification."   *Neil v. Biggers*, 409 U.S. 188, 198 (1972).   As the Court explained,

> An identification infected by improper police influence . . . is not automatically excluded.   Instead, the trial judge must screen the evidence for reliability pretrial.   If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial.   But if the indicia of reliability are not strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted . . .
>
> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers . . . When no improper law enforcement activity is involved . . , it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions . . .

*Perry v. New Hampshire,* 132 S.Ct. 716, 720-21 (2012).

The Supreme Court has held that, even if an identification procedure is unnecessarily suggestive, the admission of the suggestive identification does not violate due process so long as the identification possesses sufficient aspects of reliability, *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977), for reliability is the "linchpin in determining the admissibility of identification testimony."   *Id.* at 114; *see also United States v. Wise*, 515 F. 3d 207, 215 (3d Cir. 2008).   The central question is "'whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive."   *Brathwaite*, 432 U.S. at 106

(quoting *Biggers*, 409 U.S. at 199); *see also United States v. Maloney*, 513 F. 3d 350, 355 (3d Cir. 2008).   Moreover, "the admission of evidence of a showup without more does not violate due process."   *Biggers,* 409 U.S. at 198.   Factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199.   Significantly, the Supreme Court has ruled that, where "identifications were entirely based upon observations at the time of the [incident] and not at all induced by the conduct" of the pretrial identification procedures, the identification does not violate due process.   *See Coleman v. Alabama*, 399 U.S. 1, 7 (1970).

Here, the trial judge conducted a hearing and concluded that there was not a substantial likelihood of irreparable misidentification.   The New Jersey courts' admission of the in-court identifications of Jamie Pandure was not contrary to, or an unreasonable application of the factors which the Supreme Court requires to be considered in evaluating the likelihood of misidentification.   *See Biggers*, 409 U.S. at 199.   Under these circumstances, the adjudication of Petitioner's identification claims was not contrary to, or an unreasonable application of *Biggers* and other applicable Supreme Court jurisprudence.   Petitioner is not entitled to habeas relief on this claim.

C.      Limitation of Cross Examination of a Witness Violated Due Process (Ground Three)

In Ground Three, Pandure claims that the "restrictions of Petitioner's ability to cross-examine" Gary LaPatta, a jailhouse snitch, deprived him of a fair trial.   (ECF No. 5 at 15.) As factual support, he asserts that the trial court's preclusion of cross-examination regarding

14

LaPatta's "history of obtaining information about other inmates, without their knowledge, and then using that information to 'shake down' the inmate'" deprived him of fully challenging LaPatta's credibility.   *Id.*

Pandure raised the issue on direct appeal.   He asserted that, during the cross-examination of LaPatta, defense counsel asked him if on February 15, 1994, LaPatta was using a female outside the facility to call the jail to obtain information concerning the charges and bail set for inmates and then to use that information to try to shake down those inmates, and LaPatta answered negatively.   (ECF No. 11-22 at 70.)   He alleged that, at sidebar, the prosecutor objected to defense counsel's cross-examination, which was based on a report by a corrections officer at the Monmouth County Correctional Institute indicating that an inmate had told the officer certain information.   *Id.*   The prosecutor argued that the questions involved hearsay within hearsay and, after the trial judge noted that LaPatta had already denied the allegations in the report, the judge barred defense counsel from continuing to cross LaPatta based on the report.   *Id.*   Pandure argued that the cross-examination went to LaPatta's credibility and to his motive to fabricate Pandure's alleged inculpatory statements.   The Appellate Division affirmed on this issue for the reasons expressed by the trial court.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).   "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary or disproportionate to the purposes they are designed to

serve.'"   *Holmes*, 547 U.S. at 324 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

The Supreme Court explained in Holmes:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury . . . .   Plainly referring to rules of this type, we have stated that the Constitution permits judges to "exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice [or] confusion of the issues."   *Crane*, U.S., at 689-690 . . .
>
> A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged.   See , e.g., 41 C.J.S., Homicide § 216, pp. 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am. Jur. 2d, Homicide § 286, pp. 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)).

*Holmes*, 547 U.S. at 326-327; *see also Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Crane v. Kentucky*, 476 U.S. 683, 689-690 (1986) (permitting exclusion of evidence that "poses an undue risk of harassment, prejudice, [or] confusion of the issues") (citation and internal quotation marks omitted).

This Court has reviewed the transcript of the cross-examination of LaPatta, which shows that defense counsel attacked LaPatta's credibility and motive for testifying against Pandure at

16

great length.   (ECF 10-30 at 13-19.)   For example, LaPatta admitted on cross that he had falsely told jail officials and his probation officer that he was hearing voices in order to be transferred to Trenton Psychiatric Hospital because the food and the commissary were better than at the jail, that he cut himself and threatened to hang himself so he would get out of jail and be sent back to the psychiatric hospital, that he had been convicted of several offenses, such as robbery and making terroristic threats by telling people that he was going to blow up their families, that he used several aliases to obtain release on bail or to get a job because he had several convictions in his own name, and that he was willing to mislead people whenever it would benefit him, such helping him to out of jail sooner.   *Id.*   The record shows that the trial judge allowed defense counsel to ask LaPatta if in February 1994, while Pandure was incarcerated with LaPatta, LaPatta attempted to extort inmates at the jail, and LaPatta denied doing so.   Before the prosecutor objected, LaPatta expressly denied having a woman call the jail to obtain information about inmates that LaPatta could use to shake down those inmates.

Pandure is not entitled to habeas relief on this due process claim because he has not shown that the New Jersey courts' adjudication of Pandure's due process claim concerning the minor limits on the cross-examination of LaPatta was not contrary to, or an unreasonable application of clearly established Supreme Court holdings.

D.   Violation of Right to a Speedy Trial (Ground Four)

Pandure claims that the State's "failure to bring Petitioner to trial for more than four years after his arrest denied Petitioner his constitutional right to a speedy trial."   (ECF No. 5 at 18.)   The State argues that Pandure is not entitled to relief on this claim because he has not

17

shown that New Jersey's adjudication of the speedy trial claim was contrary to, or an unreasonable application of Supreme Court holdings.

Pandure did not move for a speedy trial in the trial court.   Rather, he raised the speedy trial claim for the first time on direct appeal in his *pro se* supplemental brief.   (ECF No. 11-25 at 7-13.)   The Appellate Division rejected the claim without discussion.   Pandure also raised the speedy trial claim before the trial court on post-conviction relief, arguing that counsel was constitutionally ineffective in failing to move for a speedy trial for four years after Pandure was arrested.   (ECF No. 12-9 at 36-38.)    The trial court rejected the claim and, again, the Appellate Division affirmed the order denying post-conviction relief without discussion of the issue.   *See State v. Pandure,* 2010 WL 1924842 (N.J. Super. Ct., App. Div., May 5, 2010).   In rejecting Pandure's ineffective assistance of counsel claim based on the failure to move for a speedy trial, the trial court stated:

> Petitioner's next contention is that defense counsel failed to raise a speedy trial violation issue and that this error materially affected the outcome of the case. Petition[er] claims his trial attorney's conduct allowed the State to improperly coach witnesses and during the delay petitioner could not focus on his trial. Again, this is a bald assertion.   Petitioner has not show[n] any dereliction by counsel and has made absolutely no showing in this regard.   He provides no reason why a competent [attorney] would have objected to the delay.   Again, the Court will not infer that just because four years lapsed between charges and the trial, that any delay was improper.   Delay of this nature normally inure[s] to the benefit of a defendant and to the State's detriment.

(ECF Nos. 11-16 at 26; 12-9 at 36.)[4]

---

[4]  This Court notes that, because the transcript of the PCR court's decision is missing every other page, the transcript contains only a portion of the PCR court's findings with respect to this claim. (ECF No. 11-16.)   Because counsel quoted the PCR court's findings with respect to the ineffective assistance of counsel for failing to move for a speedy trial, this court has included the remainder of the findings, as set forth in Pandure's appellate brief.

In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court adopted a balancing test to determine violation of the Speedy Trial Clause.   "We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right.   Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."   *Id.*; *accord United States v. Velazquez,* 749 F.3d 161, 174 (3d Cir. 2014); *Hakeem v. Beyer,* 990 F.2d 750, 770 (3d Cir. 1993).   Moreover, "to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness."   *Doggett v. United States,* 505 U.S. 647, 651-52 (1992) (citation omitted).   The Supreme Court has held in *Doggett* that the eight year delay between Doggett's indictment and arrest triggered the speedy trial inquiry, but noted that "the lower courts have generally found 'postaccusation delay'" long enough to trigger the *Barker* inquiry "at least where that delay approaches one year.   *Id.* at 652 n.1.   Once the accused makes this showing, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* at 652.   Notably, the government has the burden to justify a delay once the *Barker* inquiry has been triggered.   *See Barker,* 407 U.S. at 527; *Velazquez,* 749 F.3d at 175.

Here, the State concedes that a four-year delay from the time of Pandure's arrest to his trial was sufficient to trigger the *Barker* inquiry.   (ECF No. 13 at 14.)   However, the State argues that the delay was largely due to the fact that Pandure was charged with capital murder,

the need to conduct pretrial hearings on Pandure's *Miranda* and *Wade* motions, the question of severance, and it was not due to the prosecution's deliberate attempt to delay, or negligence. The State further argues that Pandure's failure to assert the right before the trial court and the fact that he did not raise the issue until he filed his *pro se* supplemental brief on direct appeal, "make it difficult to prove that he was denied a speedy trial." *Barker,* 407 U.S. at 532. Finally, the State argues that Pandure has not set forth how the delay prejudiced him.

This Court finds that Pandure has not shown that the New Jersey courts' rejection of his speedy trial claim was not contrary to, or an unreasonable application of *Barker* and its progeny. *See Douglas v. Cathel*, 456 F. 3d 403 (3d Cir. 2006) (affirming denial of § 2254 petition asserting violation of speedy trial because the state courts' balancing of the *Barker v. Wingo* factors was not objectively unreasonable).

E.      Denial of Impartial Jury (Ground Five)

Pandure claims in Ground Five that pretrial publicity biased the jury and deprived him of a fair trial where the trial judge failed to "affirmatively seek out potential prejudice on the part of the jury, and also neglected to provide adequate jury instructions to prevent such prejudice." (ECF No. 5 at 19.)   Specifically, he asserts as factual support that, from the date of his arrest on April 13, 1994, until the jury found him guilty on June 16, 1998, the Asbury Park Press published over 63 articles, 52% of the 300 prospective jurors acknowledged having read newspaper articles about the crime, and 11% were excused for cause on account of bias due to pretrial publicity.   *Id.*

The State argues that the Supreme Court has held that juror exposure to publicity does not presumptively violate a defendant's constitutional rights, and Pandure has not rebutted the

presumption of impartiality by pointing to anything in the record showing that the community was so poisoned against him by inflammatory pretrial publicity that a fair trial was impossible, particularly where he did not seek a change of venue and raised the juror impartiality claims for the first time on direct appeal.     (ECF No. 13 at 19-22.)

Pandure raised this claim on direct appeal in his *pro se* supplemental brief.   (ECF No. 11-25 at 13-26, 28-41.)   Relying on *Irvin v. Dowd,* 366 U.S. 717 (1961), he argued that "[t]here is no question that [the publicity] portraying defendant as the one who orchestrated the murder of his wife had to imprint itself in the minds of Community Readers – many of whom undoubtedly were eligible for, or had actually become prospective jurors in defendant's case; without possibility of eradication," *id.* at 16, and that "all of the negative media coverage collectively undermined his right to trial by a fair and impartial jury," *id.* at 21.   Pandure further argued that several prospective jurors stated during *voir dire* that they had been exposed to pretrial publicity and were predisposed to his guilt.   Notably, he did not contend that these jurors were selected. (ECF No. 11-25 at 28-31.)   The Appellate Division rejected the claim without discussion.

The Sixth Amendment of the United States Constitution provides that "the accused shall enjoy the right to . . . trial by an impartial jury."   U.S. Const. amend. VI.   "'The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'"   *Skilling v. United States*, 561 U.S. 358, 378 (2010) (citation omitted).   The Supreme Court has emphasized that its "decisions, however, cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.   Prominence does not necessarily produce prejudice, and juror

21

*impartiality*, we have reiterated, does not require *ignorance*." *Id.* at 380-81 (citation and internal quotation marks omitted) (emphasis in original). *See also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"). The Supreme Court noted that its "decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity. News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." *Skilling*, 561 U.S. 399 n.34. "Jurors . . . need not enter the box with empty heads in order to determine the facts impartially. 'It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'" *Id.* at 398-99 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record - among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a

more intimate and immediate basis for assessing a venire member's fitness for jury service." *Skilling*, 130 S.Ct. at 2918.   Lines of inquiry that "might be helpful in assessing whether a juror is impartial" are not hard to conceive.   *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991).   "To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."   *Id.* at 425-426.   Fundamental unfairness arises if *voir dire* is not "adequate . . . to identify unqualified jurors."   *Morgan*, 504 U.S. at 729.

In *Mu'Min v. Virginia*, 500 U.S. 415, the Supreme Court held that the Constitution does not require the state trial court to put questions about the content of publicity to potential jurors. *Id.* at 425-26.   The Supreme Court concluded:

> The *voir dire* examination conducted by the trial court in this case was by no means perfunctory.   The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means.   One juror admitted to having formed a belief as to petitioner's guilt and was excused for cause.   The trial court then conducted further voir dire in panels of four, and each time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion.   One juror who equivocated as to her impartiality was excused by the trial court on its own motion.

*Mu'Min*, 500 U.S. at 431.

To be sure, the Supreme Court has also held that mid-trial-publicity can result in a presumption of juror prejudice when the "proceedings . . . [are] entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob, *Murphy v. Florida,* 421 U.S. 794, 799 (1975); *see also Sheppard v. Maxwell,* 384 U.S. 333, 355 (1966 (juror prejudice presumed, *inter alia,* where

"bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially [defendant]."); *Estes v. Texas,* 381 U.S. 532, 542-43 (1965) (juror prejudice presumed where trial was conducted in a circus-like atmosphere).

In this case, Pandure acknowledges that the trial judge asked the venire of potential jurors about the effect of pretrial publicity and excused prospective jurors for cause on that basis. Moreover, the jury acquitted Pandure of conspiracy to murder witnesses and of the weapons offenses, and was unable to arrive at a unanimous verdict as to whether he had paid money or promised to pay money to have his wife murdered, thereby rendering him ineligible for the death penalty.   (ECF No. 11-27 at 2.)   As the Supreme Court noted, "'[t]he jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial.'"   *Skilling*, 561 U.S. at 384 (citation omitted). Moreover, Pandure has not shown that the *voir dire* conducted by the trial court was inadequate "to identify unqualified jurors."   *Morgan*, 504 U.S. at 729.   He has not shown that the New Jersey courts' rejection of his juror impartiality and due process claims based on publicity was contrary to, or an unreasonable application of clearly established Supreme Court precedent.   *Cf. Harris v. Ricci,* 607 F.3d 92 (3d Cir. 2010) (holding that the New Jersey courts did not unreasonably apply clearly established Supreme Court law in empaneling a jury from a different county in light of pretrial publicity surrounding the murder trial, rather than transferring the case to a different venue).   Nor did Pandure show that the New Jersey courts unreasonably applied *Sheppard* and *Estes* with respect to mid-trial publicity because the record establishes that he did

24

not argue or show that bedlam reigned in the courtroom or that reporters took over the trial. Accordingly, he is not entitled to habeas relief on his juror impartiality claim based on prejudicial pretrial and mid-trial publicity.

F.      Premature Jury Deliberation (Ground Six)

Pandure claims in Ground Six that the trial judge's failure "to conduct a hearing or to individually voir dire the jurors after receiving information that . . . jurors utilized extra-judicial material before and during their deliberations" deprived him of a fair trial and impartial jury "due to prejudicial pretrial publicity."   (ECF No. 5 at 22.)   Specifically, he asserts that during the trial juror number 12 told the court officer that jurors had been discussing witnesses and other issues presented.   He asserts that, although the judge interviewed juror number 12 on the record in the presence of counsel and the juror stated that for about a week several jurors had discussed the case in the jury room, the judge failed to individually question every juror about this issue. The State argues that, while jurors are not to prematurely discuss the trial prior to deliberations, Pandure has not shown that the trial court acted contrary to, or unreasonably applied clearly established Supreme Court holdings.   Specifically, the State asserts that the trial court followed the course of action requested by defense counsel, *i.e.,* to caution jurors at the end of the day that they are not to discuss the case among themselves or with others or read anything about the case prior to deliberations.

Pandure raised this claim on appeal in his *pro se* supplemental brief.   He described the incident that occurred on May 21, 1998, when court officer Dunn informed the trial judge that juror 12 informed him that jurors were discussing the case prior to deliberations; the trial judge interviewed juror 12 and allowed counsel to ask questions; and the trial court violated his rights

by failing to individually interview every juror to "determine on the record whether the allegations cited by juror 12 C.L. may have denied the defendant the composition of an impartial jury" because " a 'reasonable possibility' exist[ed] that any material could have affected the verdict."   (ECF No. 11-25 at 34.)   The Appellate Division rejected them without discussion on direct appeal.   (ECF No. 11-27.)

This Court has reviewed the transcript which confirms that court Officer Dunn informed the Court that juror 12 had told him during the trial that some of the jurors had been discussing the case.   (ECF No. 10-28 at 24-26.)   The trial court brought juror number 12 into chambers and she was questioned by the court and defense counsel.   She stated that for about a week, some jurors had been discussing the case and commenting that certain witness were lying or telling the truth.   The trial court asked Pandure's two attorneys what they wanted the court to do and, after noting that counsel could demand that every juror be brought in and individually questioned, Pandure's counsel stated:

> I think at this time that we know we're not prepared to have the court interview each and every juror at this time . . .   I think frankly if you tell the jury at the end of the day, they are going to be able to put this together.   But at this time in terms of our option, we think we would just as soon proceed.

(ECF No. 10-28 at 25.)

The record confirms that, at the end of the day, the trial court reminded jurors not to discuss the case among themselves or with others, "and don't discuss any witnesses," read anything about the case, or let anyone tell you what he or she read or thinks.   (ECF No. 19-28 at 36.)

This Court finds that the New Jersey courts did not unreasonably apply Supreme Court law in failing to vacate Pandure's conviction based on a juror's report to the trial court that some jurors had discussed the case before hearing all the evidence and the instructions.   While the Third Circuit has noted that "[i]t is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body," *United States v. Resko,* 3 F.3d 684, 688 (3d Cir. 1993), Pandure has not cited Supreme Court law clearly establishing this notion as constitutional law.   *Cf. Smith v. Phillips,* 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.")   Moreover, the trial judge's findings regarding juror impartiality are presumed correct, and Pandure has not rebutted this presumption or shown that the determination that premature deliberations did not deny Pandure an impartial jury or a fair trial was based on an unreasonable determination of the facts in light of the evidence presented. *Id.* at 218 ("[T]his case is a federal habeas action in which [the trial court's] findings [regarding juror impartiality] are presumptively correct[.]")   Pandure is not entitled to habeas relief on Ground Six.

G.    Ineffective Assistance of Counsel (Grounds Seven through Ten)

Pandure claims that counsel was constitutionally ineffective in failing to object to the prosecutor's use of a chart during summation and to present the defense's graphic display (Ground Seven), failing to object to the seating of juror 13, who contaminated the jury pool and failing to seek a mistrial on the basis of the misconduct of jurors 13 and 14 (Ground Eight),

27

failing to pursue on direct appeal an allegation of "extra-judicial information" (Ground Nine), and failing to either move to dismiss a female juror who had seen Pandure in restraints or to move for a mistrial on that basis (Ground Ten).

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."   U.S. Const. amend. VI.   The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.   *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).   A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.   *Id.* at 687.   First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."   *Id.* at 687-88. To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."   *Id.* at 690.   The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness[.]"   *Hinton v. Alabama,* 134 S.Ct. 1081, 1083 (2014) (*per curiam*).   To satisfy the prejudice prong, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."   *Strickland* at 693. [5]   To establish prejudice, the defendant must show that "there is a reasonable probability that the result of the trial would have been different absent the deficient act or omission."   *Hinton,* 134 S.Ct. at 1083.   "When a defendant challenges a conviction, the question is whether there is a reasonable probability that,

---

[5] The reasonable probability standard is less demanding than the preponderance of the evidence standard.   *See Nix v. Whiteside*, 475 U.S. 157, 175 (1986); *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999).

absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 1089 (quoting *Strickland,* 466 U.S. at 695).

Pandure raised these claims on post-conviction relief.   Because the Appellate Division affirmed the order denying post-conviction relief without discussion, this Court will determine whether the adjudication of the claims by the trial court unreasonably applied *Strickland.*   After reviewing Pandure's briefs and hearing the argument of counsel, the trial court ruled that Pandure failed to establish a *prima facie* ineffective assistance of counsel claim.   The PCR court found that counsel was not deficient in either failing to object to the prosecutor's use of a time chart during summation or in not presenting a defense time chart, as parties are entitled to use visual aids during summation, but such visual aids are not evidence, and counsel "made it apparent that he had a strategy to discuss the inferences that the State wanted to draw by showing a lack of direct physical evidence in the State's attempt to glorify facts in a graphic display." (Transcript, ECF No. 11-16 at 24.)   The PCR court rejected Pandure's ineffective assistance claim concerning the jury's exposure to extra-judicial information based on his assertion that "the wife of a county jail officer advised a coworker, who was a juror, she could get off the case by saying she knew the defendant's brother-in law [Francis Bennett] had been found guilty[, and that t]his contention is based on a letter sent to trial counsel by co-defendant Bennett." *Id.* at 26.   The PCR court found that Pandure had not established a *prima facie* claim of deficient performance where "[h]e does not indicate Bennett's basis of knowledge . . , [h]e has not provided the court a copy of the letter[, h]e provides absolutely nothing from the jail officer or his wife, nor is there anything from the juror who isn't even identified by the defendant." *Id.* The PCR court rejected the claim regarding the failure to seek to remove juror 13 on the ground

29

that Pandure did not assert in his certification that he asked counsel to excuse juror 13, he presented no factual basis for his contention that the jury pool was contaminated, and he failed to show prejudice.[6]   (ECF No. 12-9 at 33.)

This Court finds that Pandure is not entitled to habeas relief on his ineffective assistance of counsel claims because he has not shown that the New Jersey courts' rejection of those claims was based on an unreasonable determination of the facts in light of the evidence presented, or that it was contrary to, or an unreasonable application of *Strickland* and its progeny.

H.    Certificate of Appealability

Pandure has not made a substantial showing of the denial of a constitutional right. Therefore, no certificate of appealability will issue pursuant to 28 U.S.C. § 2253(c)(1)(B).   *See* Fed. R. App. P. 22(b)(1); 3d Cir. L.A.R. 22.2.

## IV.   CONCLUSION

This Court dismisses the Petition with prejudice and denies a certificate of appealability.


     s/Freda L. Wolfson
**FREDA L. WOLFSON, U.S.D.J.**

---

[6] This Court notes again that the transcript of the PCR court's decision is missing every other page.  (ECF No. 11-16 at 26-39.)   As a result, that transcript does not contain the basis for PCR court's rejection of Pandure's claim regarding juror 13.   However, since counsel's brief on appeal from the denial of post-conviction relief quotes the PCR court's ruling with respect to juror 13's alleged contamination of the jury pool (ECF No. 12-9 at 33), this Court presumes that the counsel correctly quoted the PCR court.   Counsel did not raise on appeal from the order denying post-conviction relief the claim that defense counsel was deficient in failing to seek dismissal of a female juror who allegedly observed Pandure in restraints.   Pandure argued in his *pro se* supplemental appellate brief that the PCR court improperly "failed to address" this argument.   (ECF No. 12-12 at 27.)   Regardless of the PCR court's failure to discuss this claim, the Appellate Division entertained and summarily rejected it, given that Pandure raised it in his *pro se* brief.

DATED:   <u>September 30,    2014</u>